## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CURT MATTHESS and KATHLEEN MATTHESS,<br><br>        Plaintiff,<br><br>v.<br><br>CHEVRON U.S.A., INC., SYNGENTA AG, AND SYNGENTA CROP PROTECTION, LLC,<br><br>        Defendants. | Civil Action No.: 3:23-pq-3852-NJR<br><br>MDL NO. 3004<br><br>COMPLAINT FOR DAMAGES AND<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiffs, by and through the undersigned attorneys, hereby files this Complaint in accordance with MDL 3004 Case Management Order No. 1, and is bound by the rights, protections, privileges, and obligations of MDL 3004 Case Management Order No. 1.

Plaintiffs state that but for the Order permitting direct filing in the Southern District of Illinois pursuant to MDL 3004 Case Management Order No. 1, Plaintiffs would have filed this Complaint in the United States District Court for the District of Connecticut and designate this Court as the place of remand as this case may have originally been filed there.

Plaintiffs further hereby allege as follows:

## I.  SUMMARY OF THE CASE

1.  Paraquat Dichloride, is a toxic chemical, developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide. Herbicide products containing Paraquat Dichloride, commonly and hereinafter referred

to as "Paraquat", chemical used as an herbicide, primarily for weed and grass control. Paraquat was first produced for commercial use in 1961, and has since been developed, registered, formulated, distributed, and sold for use in the United States, including the state of Plaintiffs' residence.[1]

2.      Defendants are companies and successors-in-interest to companies that manufactured, distributed, and sold Paraquat for use in the state of Plaintiffs' residence, acted in concert with others who manufactured, distributed, and sold Paraquat for use in the state of Plaintiffs' residence, sold and used Paraquat in the state of Plaintiffs' residence, or owned property in the state of Plaintiffs' residence where Paraquat was used.

3.      Plaintiffs bring this suit against Defendants to recover damages for personal injuries and losses of support, society, and consortium, resulting from Plaintiff CURT MATTHESS's exposure to Paraquat over many years at various places in the state of Plaintiffs' residence.

## II.      PARTIES

4.      Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

5.      Plaintiff CURT MATTHESS is a citizen and resident of the State of Connecticut who suffers from Parkinson's disease caused by exposure to Paraquat at various places within the State of Connecticut.

6.      Plaintiff KATHLEEN MATTHESS is the spouse of Plaintiff CURT MATTHESS

---

[1] *Facts About Paraquat*, CENTERS FOR DISEASE CONTROL AND PREVENTION (April 4, 2018), https://emergency.cdc.gov/agent/paraquat/basics/facts.asp#:~:text=Paraquat%20is%20a%20toxic%20chemical,a%20liquid%20in%20various%20strength

7.      Defendant Chevron U.S.A., Inc. is a Pennsylvania corporation with its principal place of business in San Ramon, California.

8.      Defendant Syngenta AG ("SAG") is a foreign corporation with its principal place of business in Basel, Switzerland.

9.      Defendant Syngenta Crop Protection, LLC ("SCPLLC") is a Delaware company with its principal place of business in Greensboro, North Carolina. SCPLLC is a wholly owned subsidiary of Defendant Syngenta AG.

### III.    JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00 exclusive of interests and costs.

11.     The District Court with proper venue pursuant to 28 U.S.C. § 1391 is the United States District Court for the District of Connecticut.

11.     Plaintiffs are residents and citizens of Connecticut.

12.     Connecticut has personal jurisdiction over Chevron U.S.A., SAG and SCPLLC.

13.     Based upon information and belief, at all relevant times, each Defendant was and is duly authorized to conduct business in Connecticut as a registered foreign corporation.

14.     Defendants regularly always conducted and solicited business within Connecticut relevant to this suit, because a substantial part of the acts or occurrences giving rise to this suit occurred within this District.

15.     Defendants at all relevant times sold marketed, and/or distributed Paraquat in Connecticut at all times relevant to this suit, because a substantial part of the acts or occurrences

giving rise to this suit occurred within this District.

16.     Defendants derive substantial revenue from goods used or consumed in Connecticut.

17.     Each Defendant engaged in continuous and systematic activity in Connecticut.

18.     Each Defendant's continuous and system activity in Connecticut and its minimum contacts within Connecticut gave rise to Plaintiffs' claims.

19.     Each Defendant purposefully availed itself of the privilege of conducting activities within Connecticut, thus invoking the benefits and protections of its laws.

20.     Each Defendant has purposefully connected itself to Connecticut and has sufficient minimum contacts with Connecticut such that Connecticut courts' assertion of jurisdiction here is reasonable and does not offend the traditional notions of fair play and substantial justice.

21.     Notwithstanding the previous paragraph, this Complaint is filed in the Southern District of Illinois pursuant to the Court's Order of June 10, 2021, allowing direct filing of actions.

## IV.     ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.  Defendants and their Predecessors

22.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

### Syngenta Entities

23.     In 1926, four British chemical companies merged to create the British company that then was known as Imperial Chemical Industries, Ltd. and ultimately was known as Imperial Chemical Industries PLC ("ICI").

4

24.     In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary.

organized under the laws of the State of Delaware, which at various times was known as

Atlas Chemical Industries, Inc., ICI North America, Inc., ICI America Inc., and ICI United

States, Inc., and ultimately was known as ICI Americas, Inc. (collectively, "ICI Americas").

25.     In or about 1992, ICI merged its pharmaceuticals, agrochemicals, and specialty

chemicals businesses, including the agrochemicals business it had operated at one time through

a wholly owned British subsidiary known as ICI Bioscience Ltd.

26.     In 1993, ICI demerged its pharmaceuticals, agrochemicals, and specialty

chemicals businesses from which it created the Zeneca Group, with the British company

Zeneca Group, PLC as its ultimate parent company.

27.     As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience

Ltd. was demerged from ICI and merged into renamed, or continued its business under the

same or similar ownership and management as Zeneca, Ltd., a wholly owned British

subsidiary of Zeneca Group, PLC.

28.     Before ICI's demerger and creation of the Zeneca Group, ICI had a Central

Toxicology Laboratory that performed and hired others to perform health and safety studies that

were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental

Protection Agency ("EPA") to secure and maintain the registration of Paraquat and other

pesticides for use in the United States.

29.     As a result of ICI's demerger and creation of the Zeneca Group, ICI's

Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.

30.     After ICI's demerger and creation of the Zeneca Group, Zeneca Ltd.'s

Central Toxicology Laboratory continued to perform and hire others to perform health and

safety studies that were submitted to EPA to secure and maintain the registration of

Paraquat and other pesticides for use in the United States.

31.     As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.

32.     In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.

33.     As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd., organized under the laws of the State of New York, was merged into or continued its business under the same or similar ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

34.     In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca were wholly owned subsidiaries.

35.     In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant Syngenta AG ("SAG") as the ultimate parent company.

36.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British

subsidiary of SAG.

37.     As a result of the Novartis/AstraZeneca spinoff and merger that created the

Syngenta Group, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s

Central Toxicology Laboratory.

38.     Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta

Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire

others to perform health and safety studies for submission to the EPA to secure and maintain

registration of Paraquat and other pesticides for use in the United States.

39.     As a result of the Novartis/AstraZeneca spinoff and merger that created the

Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their

business under the same or similar ownership and management, as Syngenta Crop Protection,

Inc. ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the State of

Delaware.

40.     In 2010, SCPI was converted into Defendant Syngenta Crop Protection, LLC

("SCPLLC"), a wholly owned subsidiary of SAG organized and existing under the laws of the

State of Delaware with its principal place of business in Greensboro, North Carolina.

41.     SAG is a successor-in-interest to the crop protection business of its

corporate predecessor Novartis AG.

42.     SAG is a successor-in-interest to the crop protection business of its

corporate predecessor AstraZeneca PLC.

43.     SAG is a successor-in-interest to the crop protection business of its

corporate predecessor Zeneca Group PLC.

44.     SAG is a successor-in-interest to the crop protection business of its corporate

predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.

45.      SAG is a successor-in-interest to the crop protection business of its corporate predecessor ICI Bioscience Ltd.

46.      SAG is a successor-in-interest to the crop protection business of its corporate predecessor Plant Protection Ltd.

47.      SCPLLC is a successor-in-interest to the crop protection business of its corporate predecessor SCPI.

48.      SCPLLC is a successor-in-interest to the crop protection business of its corporate predecessor NCPI.

49.      SCPLLC is a successor-in-interest to the crop protection business of its corporate predecessor Ciba-Geigy Corporation.

50.      SCPLLC is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.

51.      SCPLLC is registered to do business in the state of Plaintiffs' residence.

52.      SCPLLC does substantial business in the state of Plaintiffs' residence; specifically, it:

   a.   Markets, advertises, distributes, sells, and delivers Paraquat and other pesticides to distributors, dealers, applicators, and farmers in the state of Plaintiffs' residence;

   b.   Secures and maintains the registration of Paraquat and other pesticides with the EPA to enable itself and others to manufacture, distribute, sell, and use these

products in the State of Plaintiffs' residence; and

    c.  Performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of pesticides in the state of Plaintiffs' residence.

53.    SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland.

54.    SAG is a holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SCPLLC.

55.    SAG is a management holding company.

56.    Syngenta Crop Protection AG ("SCPAG"), a Swiss Corporation with its principal place of business in Basel, Switzerland, is one of SAG's direct, wholly owned subsidiaries.

57.    SCPAG employs the global operational managers of productions, distribution, and marketing for the Syngenta Group's Crop Protection ("CP") and Seeds Division.

58.    The Syngenta Group's CP and Seeds Divisions are not now nor have they ever been corporations or other legal entities.

59.    SCPAG directly and wholly owns Syngenta International AG ("SIAG").

60.    SIAG is the "nerve" center through which SAG manages the entire Syngenta Group.

61.    SIAG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.

62.    SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance.

63.     Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

64.     SAG is the indirect parent of SCPLLC through multiple layers of corporate ownership:

> a. SAG directly and wholly owns Syngenta Participations AG;
>
> b. Syngenta Participations AG directly and wholly owns Seeds JV C.V.;
>
> c. Seeds JV C.V. directly and wholly owns Syngenta Corporations;
>
> d. Syngenta Corporation directly and wholly owns Syngenta Seeds, LLC;
>
> e. Syngenta Seeds, LLC directly and wholly owns SCPLLC.

65.     Before SCPI was converted to SCPLLC, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors.

66.     SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

67.     SAG has purposefully organized the Syngenta Group, including SCPLLC, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.

68.     Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCPLLC, through a "matrix management" system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

69.     The lines of authority and control within the Syngenta Group do not follow its

formal legal structure, but instead follow this global "functional" management structure.

70.　　SAG controls the actions of its far-flung subsidiaries, including SCPLLC, through this global "functional" management structure.

71.　　SAG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SCPLLC.

72.　　The SEC consists of the CEO and various global Heads, which currently are:

　　　　a. The Chief Executive Officer;

　　　　b. Group General Counsel;

　　　　c.　The President of Global Crop Protection;

　　　　d.　The Chief Financial Officer;

　　　　e.　The President of Global Seeds; and

　　　　f.　The Head of Human Resources.

73.　　SIAG employs all of the members of the Executive Committee.

74.　　Global Syngenta Group corporate policies require SAG subsidiaries, including SCPLLC, to operate under the direction and control of the SEC, and other unincorporated global management teams.

75.　　SAG's board of directors meets five to six times per year.

76.　　In contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SCPLLC.

77.　　Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e- mail to

SCPI board members.

78.     Since SCPI became SCPLLC, decisions that are nominally made by the board or managers of SCPLLC, in fact, continue to be directed by the SEC or other Syngenta Group global or regional managers.

79.     Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers.

80.     Since SCPI became SCPLLC, the appointment and removal of the manager(s) of SCPLLC continues to be directed by the SEC or other Syngenta Group Global or regional managers.

81.     The management structure of the Syngenta Group's CP Division, of which SCPLLC is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.

82.     Atop the CP Division is the CP Leadership Team (or another body with a different name by substantially the same composition and functions), which includes the President of Global Crop Protection, the CP Region Heads (including SCPLLC President Vern Hawkins), and various global corporate function Heads.

83.     The CP Leadership Team meets bi-monthly to develop strategies for new products, markets, and operational efficiencies, and to monitor performance of the Syngenta Group's worldwide CP business.

84.     Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Group's U.S.

and Canadian CP business (and when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).

85.     The North America Regional Leadership Team is chaired by SCPLLC's president and includes employees of SCPLLC and the Syngenta Group's Canadian CP Company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

86.     The Syngenta Group's U.S. and Canadian CP companies, including SCPLLC, report to the North America Regional Leadership Team, which reports to the CP Leadership Team, which reports to the SEC, which reports to SAG's board of directors.

87.     Some members of the North America Regional Leadership Team, including some SCPLLC employees, report or have in the past reported not to their nominal superiors within the companies that employ(ed) them, but directly to the Syngenta Group's global Heads.

88.     Syngenta Group global Heads that supervise SCPLLC employees participate and have in the past participated in the performance reviews of these employees and in setting their compensation.

89.     The Syngenta Group's functional reporting lines have resulted in employees of companies, including SCPLLC, reporting to officers of remote parent companies, officers of affiliates with no corporate relationship other than through SAG, or officers of subsidiary companies.

90.     SCPLLC performs its functions according to its role in the CP Division structure:

a.    CP Division development projects are proposed at the global level, ranked and funded at the global level after input from functional entities such as the CP Leadership Team and the North America Regional Leadership Team, and given

final approval by the SEC;

b.  New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire CP division;

c.  These products are then tested by other Syngenta Group companies, including SCPLLC, under the direction and supervision of the SEC, the CP Leadership Team, or other Syngenta Group global managers;

d.  Syngenta Group companies, including SCPLLC, do not contract with or compensate each other for this testing;

e.  Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

f.  If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), no individual Syngenta Group companies such as SCPLLC, decide whether to sell the product;

g.  Decisions to sell the product must be approved by the SEC; and

h.  The products that are sold all bear the same Syngenta trademark and logo.

91.    SCPLLC is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group companies.

92.    These "reserved" powers require Syngenta Group companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting

structure.

93.     For example, although SAG permits Syngenta Group companies to handle small legal matters on their own, under the "reserved" powers" system, SAG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SCPLLC, if their value exceeds an amount specified in the "reserved powers."

94.     Similarly, the appointments of senior managers at SCPLLC must be approved by higher levels than SCPLLC's own management, board of directors, or even its direct legal owner.

95.     Although SCPLLC takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

96.     Although SAG subsidiaries, including SCPLLC, pay lip-service to legal formalities that give the appearance of authority to act independently, in practice, many of their acts are directed or pre-approved by the Syngenta Group's global management.

97.     SAG and the global management of the Syngenta Group restrict the authority of SCPLLC to act independently in areas including:

a. Product development;

b. Product testing (among other things, SAG and the global management of the Syngenta Group require SCPLLC to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SCPLLC submits to the EPA in support of the registrations of Paraquat and other pesticides);

c.   Production;

d.  Marketing;

e.  Sales;

f.  Human resources;

g.  Communications and public affairs;

h.  Corporate structure and ownership;

i.  Asset sales and acquisitions;

j.  Key appointments to boards, committees, and management positions;

k.  Compensation packages;

l.  Training for high-level positions; and

m.  Finance (including day-to-day cash management) and tax.

98.     Under the Syngenta Group's functional management system, global managers initiate and the global Head of Human Resources oversees international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.

99.     Under this international assignment program, at the insistence of Syngenta Group global managers, SCPLLC officers and employees have been "seconded" to work at other SAG subsidiaries, and officers and employees of other Syngenta Group subsidiaries have been "seconded" to work at SCPLLC.

100.    The Syngenta Group's functional management system includes a central global finance function—known as Syngenta Group Treasury—for the entire Syngenta Group.

101.    The finances of all Syngenta Group companies are governed by a global

treasury policy that subordinates the financial interests of SAG's subsidiaries, including SCPLLC, to the interests of the Syngenta Group as a whole.

102.    Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SCPLLC, holds the cash on account, and lends it to other subsidiaries that need liquidity.

103.    The Syngenta Group's global treasury policy does not allow SAG subsidiaries such as SCPLLC to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.

104.    Syngenta Group Treasury also decides whether SCPLLC will issue a dividend or distribution to its direct parent company, and how much that dividend will be.

105.    SCPLLC's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

106.    In 2011, the U.S. District Court for the Southern District of Illinois held that SAG's unusually high degree of control over SCPLLC made SCPLLC the agent or alter ego of SAG. *See*, *City of Greenville, Ill. v. Syngenta Crop Protection, Inc.,* 830 F. Supp. 2d 550 (S.D. Ill. 2011),

107.    SAG continues to exercise the unusually high degree of control over SCPLLC that led the District Court to find in 2011 that SAG was subject to jurisdiction in the State of Illinois.

108.    SAG, through its agent or alter ego, SCPLLC, does substantial business in the state of Plaintiffs' residence, in the ways previously alleged as to SCPLLC.

**Chevron Entities**

109.     Chevron Chemical Company ("Chevron Chemical") was a corporation organized in 1928 under the laws of the State of Delaware.

110.     In 1997, Chevron Chemical was merged into Chevron Chemical Company, LLC ("Chevron Chemical LLC"), a limited liability company organized under the laws of the State of Delaware.

111.     In the mid-2000s, Chevron Chemical LLC was merged into or continued to operate under the same or similar ownership and management as Chevron Philips Chemical Company LP ("CP Chemical"), a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business in The Woodlands, Texas.

112.     CP Chemical is a successor-in-interest to the crop protection business of its corporate predecessor Chevron Chemical.

113.     Defendant Chevron U.S.A., Inc. ("Chevron USA") is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in the State of California.

114.     Defendant Chevron USA is a successor-in-interest to the crop protection business of its corporate predecessor Chevron Chemical LLC.

115.     Defendant Chevron USA is a successor-in-interest to the crop protection business of its corporate predecessor CP Chemical.

116.     Chevron USA is registered to do business in the state of Plaintiffs' residence.

117.     In the mid-2000s, Chevron USA entered into an agreement in which it expressly assumed the liabilities of Chevron Chemical and Chevron Chemical LLC arising from Chevron Chemical's then-discontinued agrichemical business, which included the design, registration, manufacture, formulation, packaging, labeling, distribution, marketing,

and sale of Paraquat products in the United States as alleged in this Complaint.

## B. Paraquat Manufacture, Distribution, and Sale

118.     ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of Paraquat in 1955.

119.     The leading manufacturer of Paraquat is Syngenta, which (as ICI) developed the active ingredient in Paraquat in the early 1960s.

120.     ICI produced the first commercial Paraquat formulation and registered it in England in 1962.

121.     Paraquat was marketed in 1962 under the brand name Gramoxone.

122.     Paraquat first became commercially available for use in the United States in 1964.

123.     In or about 1964, ICI and Chevron Chemical entered into agreements regarding the licensing and distribution of Paraquat ("the ICI-Chevron Chemical Agreements").

124.     In or about 1971, ICI Americas became a party to the ICI-Chevron Chemical Agreements on the same terms as ICI.

125.     The ICI-Chevron Chemical Agreements were renewed or otherwise remained in effect until about 1986.

126.     In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical a license to their patents and technical information to permit Chevron Chemical to formulate or have formulated, use, and sell Paraquat in the United States and to grand sub-licenses for others to do so.

127.     In the ICI-Chevron Chemical Agreements, Chevron Chemical granted ICI and ICI Americas a license to its patents and technical information to permit ICI and ICI Americas

to formulate or have formulated, use, and sell Paraquat throughout the world and to grant sub-licenses for others to do so.

128.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical agreed to exchange patent and technical information regarding Paraquat.

129.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical exclusive rights to distribute and sell Paraquat in the United States.

130.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical a license to distribute and sell Paraquat in the U.S. under the ICI-trademarked brand name Gramoxone.

131.    ICI and ICI Americas and Chevron Chemical entered into the ICI-Chevron Chemical Agreements to divide the worldwide market for Paraquat between them.

132.    Under the ICI-Chevron Chemical Agreements, Chevron Chemical distributed and sold Paraquat in the U.S. and ICI and ICI Americas distributed and sold Paraquat outside the United States.

133.    Under the ICI-Chevron Chemical Agreements and related agreements, both ICI and ICI Americas and the Chevron Chemical distributed and sold Paraquat under the ICI-trademarked brand name Gramoxone.

134.    Under the ICI-Chevron Chemical Agreements, ICI and ICI Americans and Chevron Chemical exchanged patent and technical information regarding Paraquat.

135.    Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas provided to Chevron Chemical health and safety and efficacy studies performed or procured by ICI's Central Toxicology Laboratory, which Chevron Chemical then submitted to the USDA and the

EPA to secure and maintain the registration of Paraquat for manufacture, formulation, distribution, and sale for use in the United States.

136.    Under the ICI-Chevron Chemical Agreements and related agreements, ICI and ICI Americas manufactured and sold Paraquat to Chevron Chemical that Chevron Chemical then distributed and sold in the United States, including in the state of Plaintiffs' residence, where Chevron Chemical marketed, advertised, and promoted them to distributors, dealers, applicators, and farmers.

137.    Under the ICI-Chevron Chemical Agreements and related agreements, Chevron Chemical distributed and sold Paraquat in the United States under the ICI-trademarked brand name Gramoxone and other names, including in the state of Plaintiffs' residence, where Chevron Chemical marketed, advertised, and promoted them to distributors, dealers, applicators, and farmers.

138.    SAG and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributes, and sold Paraquat for use in the United States from about 1964 through the present, and at all relevant times intended or expected their Paraquat products to be distributed and sold in the state of Plaintiffs' residence, where they marketed, advertised, and promoted them to distributors, dealers, applicators, and farmers.

139.    SAG and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the registration of Paraquat for manufacture, formulation, distribution, and sale for use in the United States from about 1964 through the present.

140.    SCPLLC and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold Paraquat for use in the United

States from about 1971 through the present, and at all relevant times intended or expected their Paraquat products to be distributed and sold in the state of Plaintiffs' residence, where they marketed, advertised, and promoted them to distributors, dealers, applicators, and farmers.

141.     SCPLLC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the EPA to support the registration of Paraquat for manufacture, formulation, distribution, and sale for use in the United States from about 1971 through the present.

142.     Chevron Chemical manufactured, formulated, distributed, and sold Paraquat for use in the United States from about 1964 through at least 1986, acting in concert with ICI and ICI Americas throughout this period, including in the state of Plaintiffs' residence, where Chevron Chemical marketed, advertised, and promoted them to distributors, dealers, applicators, and farmers.

143.     From approximately 1976 to 1984, Plaintiff CURT MATTHESS was repeatedly exposed to and inhaled, ingested, or absorbed Paraquat, while working on railroad tracks and bridges sprayed with the chemical, during his employment as an iron worker with Conrail.

144.     Plaintiff CURT MATTHESS was diagnosed with Parkinson's Disease in or around October 2016 by Dr. Joy Antonelle De Marcaida, MD at Hartford Health in Hartford, Connecticut.

145.     No doctor or any other person told Plaintiff CURT MATTHESS that his Parkinson's Disease was or could have been caused by exposure to Paraquat.

146.     Plaintiff CURT MATTHESS had never read or heard of any articles in

newspapers, scientific journals, or other publications that associated Parkinson's Disease with Paraquat.

147.    Plaintiff had never read or heard of any lawsuit alleging that Paraquat causes Parkinson's Disease.

148.    At no time when using Paraquat, was Plaintiff CURT MATTHESS aware that his exposure to Paraquat could carry any latent injury, including any neurological injury or Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to Paraquat.

149.    The Paraquat to which Plaintiff was exposed was sold and used in the state of Plaintiffs' residence, and was manufactured, distributed, and on information and belief sold by one or more of the Defendants and their corporate predecessors and others with whom they acted in concert intending or expecting that it would be sold and used in the state of Plaintiffs' residence.

150.    On information and belief, Plaintiff was exposed to Paraquat manufactured, distributed, and sold at different times as to each Defendant, their corporate predecessors, and others with whom they acted in concert, and not necessarily throughout the entire period of exposure as to any particular Defendant, its corporate predecessors, and others with whom they acted in concert.

151.    On information and belief, Plaintiff was exposed to Paraquat that was sold and used in the state of Plaintiffs' residence, and was manufactured, distributed, and sold by SCPLLC, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending or expecting that it would be sold and used in the state of Plaintiffs' residence.

152.    On information and belief, Plaintiff was exposed to Paraquat that was sold and used in the state of Plaintiffs' residence, and was manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending or expecting that it would be sold and used in the state of Plaintiffs residence.

153.    On information and belief, Plaintiff was exposed to Paraquat that was sold and used in the state of Plaintiffs' residence, and was manufactured, distributed, and sold by Chevron Chemical, acting in concert with ICI and ICI Americas, intending or expecting that it would be sold and used in the state of Plaintiffs' residence.

### C.    Paraquat Use

154.    Since 1964, Paraquat has been used in the United States to kill broadleaf weeds and grasses before the planting or emergency of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest. At all relevant times, the use of Defendants' Paraquat for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants.

155.    At all relevant times, where Paraquat was used, it was commonly used multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year, and such use was as intended or directed or reasonably foreseeable. The use of Defendants' Paraquat for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by Defendants.

156.    At all relevant times, Paraquat manufactured, distributed, sold and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with

whom they acted in concert was typically sold to end-users in the form of liquid concentrates (and less commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank of a sprayer and applied by spraying it onto target weeds.

157.    At all relevant times, concentrates containing Paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant) before use.

158.    At all relevant times, Paraquat typically was applied with a knapsack sprayer, hand-held sprayer, aircraft (i.e., crop duster), truck with attached pressurized tank, or tractor- drawn pressurized tank, and such use was as intended or directed and/or was reasonably foreseeable.

### D.   Paraquat Exposure

159.    At all relevant times, it was reasonably foreseeable that when Paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to Paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks.

160.    At all relevant times, it was reasonably foreseeable that when Paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, persons who sprayed Paraquat or were in or near areas where it was being or recently had been sprayed would be exposed to Paraquat, including as a result of spray drift, the movement of herbicide

spray droplets from the target area to an area where herbicide application was not intended, typically by wind, and as a result of contact with sprayed plants.

161.    At all relevant times, it was reasonably foreseeable that when Paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to Paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines or valves were being cleared.

162.    At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

163.    At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurred.

164.    At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

165.    At all relevant times, it was reasonably foreseeable that Paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

166.    At all relevant times, it was reasonably foreseeable that Paraquat that entered the human body, whether via absorption, respiration, or ingestion, could enter the bloodstream.

167.    At all relevant times, it was reasonably foreseeable that Paraquat that entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

168.    At all relevant times, it was reasonably foreseeable that Paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

### E.   Parkinson's Disease

169.    Parkinson's Disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

170.    Scientists who study Parkinson's Disease generally agree that fewer than 10% of all Parkinson's Disease cases are caused by inherited genetic mutations alone, and that more than 90% of cases are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

171.    The characteristic symptoms of Parkinson's Disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

172.    Parkinson's Disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficult swallowing; and excess saliva and drooling caused by reduced swallowing movements.

173.    Non-motor symptoms such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression are present in most cases of Parkinson's Disease, often for years before any of the primary motor symptoms appear.

174.    There is currently no cure for Parkinson's Disease. No treatment will slow, stop, or reverse its progression, and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and cause unwelcome side effects, the longer they are used.

175.    The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of Parkinson's Disease.

176.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell or gland cell) that is critical to the brain's control of motor function (among other things).

177.    The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

178.    Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's Disease.

179.    The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's Disease.

180.    Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present I cells and cells antioxidant

28

defenses.

181.    Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in, if not the precipitating cause of, the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's Disease.

### F. Paraquat's Toxicity

182.    Paraquat is highly toxic to both plants and animals.

183.    Paraquat injures and kills plants by creating oxidative stress that causes or contributes to cause the degeneration and death of plant cells.

184.    Paraquat injures and kills humans and other animals by creating oxidative stress that causes or contributes to cause the degeneration and death of animal cells.

185.    Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

186.    The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life—photosynthesis in the case of plant cells and cellular respiration in the case of animal cells.

187.    The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids—molecules that are essential components of the structures and functions of living cells.

188.     Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

189.     Paraquat's redox properties have been known since at least the 1960s.

190.     That Paraquat is toxic to the cells of plants and animals because it creates oxidative stress through redox cycling has been known since at least the 1960s.

191.     The surfactants with which the concentrates containing Paraquat manufactured, distributed, and sold by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated were likely to increase Paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous membranes, and other epithelial tissues, including the tissues of the mouth, nose and nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

### G.  Paraquat and Parkinson's Disease

192.     The same redox properties that make Paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons—Paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons by creating oxidative stress through redox cycling.

193.     Although Parkinson's Disease is not known to occur naturally in any species other than humans, Parkinson's Disease research is often performed using "animal models," in which scientists artificially produce in laboratory animals, conditions that show features of Parkinson's Disease.

194.     Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's Disease.

195.    In animal models of Parkinson's Disease, hundreds of studies involving various routes of exposure have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's Disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's Disease.

196.    Hundreds of in vitro studies have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

197.    Many epidemiological studies (studies of the patients and cases of disease in defined populations) have found an association between Paraquat exposure and Parkinson's Disease, including multiple studies finding a two- to five-fold or greater increase in the risk of Parkinson's Disease in populations with occupational exposure to Paraquat compared to populations without such exposure.

### H.    Paraquat Regulation

198.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C § 136 et seq., which regulates the distribution, sale, and use of pesticides within the United States, requires that pesticides be registered with the EPA prior to their distribution, sale of use, except as described by FIFRA. 7 U.S.C § 136a(a).201.

199.    As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

200.    As a general rule, FIFRA requires registrants to perform health and safety testing of pesticides.

201.    FIFRA does not require the EPA to perform health and safety testing of pesticides itself, and the EPA generally does not perform such testing.

202.    The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

a. Its composition is such as to warrant the proposed claims for it, 7 U.S.C §
   136a(c)(5)(A);

b.  Its labeling and other material required to be submitted comply with the
    requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

c.  It will perform its intended function without unreasonable adverse effects on the
    environment, 7 U.S.C. § 136a(c)(5)(C); and

d.  When used in accordance with widespread and commonly recognized practice it
    will not generally cause unreasonable adverse effects on the environment, 7
    U.S.C. § 136a(c)(5)(D).

203.    FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C § 136(bb).

204.    Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]" 7 U.S.C. § 136a(f)(2).

205.    However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]" 7 U.S.C. § 136a(f)(2).

206.    The distribution or sale of a pesticide that is misbranded is an offense under

FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person…any pesticide which is …misbranded." 7 U.S.C. § 136j(a)(1)(E)

207.     A pesticide is misbranded under FIFRA if, among other things:

a. Its labeling bears any statement, design, or graphic representation relative thereto or its ingredients that is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

b.   The labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under Section 136a(d) of the title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)91)(F); or

c.   The label does not contain a warning or caution statement that may be necessary and if complied with, together with any requirements imposed under section 136a(d) of the title, is adequate to protect health and the environment." 7 U.S.C. § 136(q)(1)(G).

208.     Plaintiff(s) do not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of Paraquat or warnings about Paraquat, breached a duty to provide adequate packaging for Paraquat, or concealed, suppressed, or omitted to disclose any material fact about Paraquat or engaged in any unfair or deceptive practice regarding Paraquat, that allegation is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the

Paraquat "misbranded' under FIFRA; however, Plaintiff(s) brings claims and seek relief in this action only under state law and does not bring any claims or seek any relief in this action under FIFRA.

## ESTOPPEL FROM PLEADING STATUTES OF LIMITATIONS OR REPOSE

209.    Plaintiff incorporates by reference all prior allegations.

210.    Plaintiff brings these claims within the applicable statute of limitations because Plaintiff and Plaintiffs' employer did not discover and could not reasonably discover the defects and unreasonably dangerous condition of Paraquat.

211.    Plaintiffs' ignorance of the defective and unreasonably dangerous nature of Paraquat and the causal connection between these defects and Plaintiffs' injuries and damages is due to Defendants' fraudulent conduct.

212.    Each Defendant's fraudulent conduct includes intentional concealment of material information from the public, and intentional misrepresentation of material information and/or downplay of the serious threat to public safety that Paraquat use presents.

213.    Defendants intentionally concealed material information including but not limited to the fact that Paraquat carried with it the serious risks and dangerous defects described herein.

214.     Indeed, in response to growing concerns regarding the safety of Paraquat, Syngenta published a website at www.paraquat.com for the purpose of convincing the public that Paraquat is safe.

215.    Defendants' fraudulent conduct was directed at Plaintiff, Plaintiff CURT MATTHESS's employer, the agricultural community, and the public at large.

216.    Each Defendant had a duty to disclose the fact that Paraquat was unreasonably dangerous; and using Paraquat for weed and grass control carried serious, hidden risks.

217.     Defendants knew or should have known that Paraquat was a highly toxic substance that can cause severe neurological injuries and impairment.

218.     Indeed, in response to growing concerns regarding the safety of Paraquat, Syngenta published a website at www.paraquat.com for the purpose of convincing the public that Paraquat is safe.

219.     Even today, Syngenta disavows any connection between Paraquat and Parkinson's disease.

220.     Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of the facts as alleged herein by the Defendants.

221.     Plaintiff has been kept ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on Plaintiffs' part.

222.     Plaintiff could not reasonably have discovered the injury and/or its cause until shortly before the initiation of this action.

223.     Each Defendant is estopped from relying on any statutes of limitation or repose affirmative defense by virtue of each Defendant's unclean hands, acts of fraudulent concealment, and affirmative misrepresentations and omissions of material fact.

## COUNT I STRICT PRODUCT LIABILITY DESIGN DEFECT and MANUFACTURING DEFECT against all DEFENDANTS

1.     Plaintiff incorporates by reference all prior allegations.

2.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the U.S. Paraquat business.

3.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, designed, researched, developed, manufactured, tested, labeled,

advertised, promoted, marketed, sold, supplied, and/or distributed Paraquat.

4. Defendants, Defendants' corporate predecessors, and others with whom they acted in concert had a duty to design, create, manufacture, market, distribute, and sell a product that was reasonably safe and not unreasonably dangerous for its normal, common, and intended use.

5. Paraquat was expected to, and did, reach the intended users, handlers, and persons coming in contact with the product with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Defendants.

6. Paraquat was manufactured, designed, marketed, labeled, and sold in a defective condition, for use by Plaintiff, Plaintiffs' employer, and/or all other users of the product, making the product unreasonably dangerous.

7. Paraquat, as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, was defective in design and formulation in that when it left the hands of the manufacturers, suppliers, and distributors, the foreseeable risks of harm caused by the product exceeded the claimed benefits of the product.

8. Paraquat, as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, was defective in design and formulation, because when it left the hands of Defendants the product was unreasonably dangerous and was also more dangerous than expected by the ordinary consumer.

9. Paraquat was manufactured or designed such that it unreasonably increased the risk of developing, causing, or contributing to cause, clinically significant neurodegenerative disease, including Parkinson's Disease.

10.     Paraquat was not reasonably fit, suitable, or safe for its anticipated use, and safer, reasonable alternative designs existed and could have been utilized.

11.     Reasonably prudent manufacturers and distributors would not have placed the product in the stream of commerce with knowledge of these design flaws.

12.     Alternatively, the Paraquat herbicide which Plaintiff was exposed to, failed to perform its intended function due to a flaw in the manufacturing process because: the product deviated from its manufacturing standards when it came off the production line; failed to perform in its intended manner due to some flaw in its fabrication process; was not manufactured and/or processed pursuant to its specifications; and/or, as constructed, deviated from any such specifications or design.

13.     Reasonably prudent manufacturers and distributors would not have placed the product in the stream of commerce with knowledge of these manufacturing flaws.

14.     At all times relevant to this action, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, knew, and had reason to know that Paraquat was inherently defective and unreasonably dangerous as designed, formulated, and manufactured by Defendants and when used and administered in the form manufactured and distributed by Defendants and in the manner instructed by Defendants, to be sprayed and administered.

15.     Paraquat was expected to, and did, reach the marketplace and consumers with no substantial change in the condition in which the product was put into the stream of commerce by Defendants.

16.     When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the Paraquat to

which Plaintiff was exposed, it was reasonably foreseeable to Defendants, Defendants'
corporate predecessors, and others with whom they acted in concert that Plaintiff and other
members of the public were likely to be in or near places were Paraquat was being or recently
had been used.

17.     Plaintiff was exposed to Paraquat as a result of the use of Paraquat for the purpose
intended by Defendants, and reasonably foreseeable to Defendants, Defendants' corporate
predecessors, and others with whom they acted in concert, and in a manner normally intended to
be used and administered, namely for weed and grass control.

18.     When Defendants, Defendants' corporate predecessors, and others with
whom they acted in concert designed, manufactured, distributed, and sold the Paraquat to
which Plaintiff was exposed, it was reasonably foreseeable, and Defendants, Defendants'
corporate predecessors, and others with whom they acted in concert knew or in the exercise
of ordinary care should have known, that when Paraquat was used in the intended and
directed manner or a reasonably foreseeable manner:

      a. It was designed, manufactured, formulated, and packaged such that it was
          likely to be inhaled, ingested, and absorbed into the bodies of persons who used
          it, who were nearby while it was being used, or who entered fields or orchards
          where it had been sprayed or areas near where it had been sprayed; and

      b. When inhaled, ingested, or absorbed into the bodies of persons who used it, who
          were nearby while it was being used, or who entered fields or orchards where it
          had been sprayed or areas near where it had been sprayed, it was likely to cause
          or contribute to cause latent neurological damage that was both permanent and
          cumulative, and repeated exposures were likely to cause or contribute to cause

clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure.

19.     In breach of the aforementioned duty to members of the public, including Plaintiff, in manufacturing, distributing, and selling Paraquat for use in the state of Plaintiffs' residence, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, negligently:

a. Failed to design, manufacture, formulate, and package Paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

b. Designed, manufactured, and formulated Paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure;

c. Failed to perform adequate testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used or who entered fields, orchards or railways where it had been sprayed or areas near where it had been sprayed;

d.   Failed to perform adequate testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drive, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.   Failed to perform adequate testing to determine the extent to which Paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure;

f.   Failed to perform adequate testing to determine the extent to which Paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields, orchards, or railways where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure;

g.  Failed to direct that Paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields, orchards, or railways where it had been sprayed or areas near where it had been sprayed; and

h.  Failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields, orchards or railways where it had been sprayed or areas near where it had been sprayed, Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure.

20.  Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, placed Paraquat into the stream of commerce with the actual or constructive knowledge that it would be used without inspection for defects.

21.  Users and/or populations with occupational and/or residential exposure, including but not limited to Plaintiff and/or Plaintiffs' employer, could not, by the exercise of reasonable care, have discovered the defective condition of Paraquat and/or perceived its defective dangers prior to his exposure to Plaintiff.

22.  The defective Paraquat herbicide was a substantial, proximate, and contributing factor in causing Plaintiffs' Parkinson's disease.

23.     As a proximate result of the defective design and/or manufacture of Paraquat, and Plaintiffs' exposure to Paraquat, Plaintiff suffered serious physical injuries, Plaintiff developed Parkinson's Disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that otherwise he would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life..

24.     Defendants SCPLLC, and SAG, Defendants' corporate predecessors, and others with whom they acted in concert, are therefore strictly liable for the Plaintiffs' injuries and damages sustained proximately caused by Plaintiffs' use of the product.

25.     Defendant Chevron U.S.A, Defendants' corporate predecessors, and others with whom they acted in concert, are therefore strictly liable for the Plaintiffs' injuries and damages sustained proximately caused by Plaintiffs' use of the product.

26.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, are jointly and severally liable to Plaintiff for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief.

### COUNT II STRICT PRODUCT LIABILITY- FAILURE TO WARN against DEFENDANTS

27.     Plaintiff incorporates by reference all prior allegations.

28.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, were engaged in the U.S. Paraquat business.

29.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, designed, researched, developed, manufactured, tested, labeled,

advertised, promoted, marketed, sold, supplied, and/or distributed Paraquat intending or expecting that it would be sold and used in the state of Plaintiffs' residence.

30.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, distributed, and/or introduced into the stream of commerce Paraquat, and directly advertised, marketed, and/or promoted the product to consumers, including in the state of Plaintiffs' residence, and persons responsible for consumers; therefore, each Defendant had a duty to warn of the risks associated with the use of Paraquat.

31.     The Paraquat herbicide was under the exclusive control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert.

32.     The Paraquat herbicide was defective at the time it left Defendants', Defendants' corporate predecessors', and others with whom they acted in concert's control because the vaccine failed to include adequate warnings, instructions, and directions relating to the dangerous risks associated with the use of Paraquat for weed and grass control.

33.     Paraquat was intended to be sprayed on farms, orchards, and/or railways for weed and grass control.

34.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, placed Paraquat into the stream of commerce with the actual or constructive knowledge that it would be used without inspection for defects.

35.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, placed Paraquat into the stream of commerce intending or expecting that it would be sold and used in the state of Plaintiffs' residence.

36.     Plaintiffs' exposure to Paraquat was reasonably foreseeable.

37.     The Paraquat herbicide was expected to, and did, reach Plaintiff and consumers in Plaintiffs' state of residence with no substantial change in the condition in which Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, put the product into the stream of commerce.

38.     The Paraquat herbicide was advertised, promoted, marketed, sold, supplied, and/or distributed in Plaintiffs' state of residence for its intended purpose of weed and grass control.

39.     Plaintiff was exposed to Paraquat sold and used in the state of Plaintiffs' residence that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in the state of Plaintiffs' residence.

40.     The Paraquat herbicide was defective due to inadequate warnings or instructions because Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, knew or should have known that the product created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or populations with occupational and/or residential exposure.

41.      Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, failed to provide adequate warnings to consumers and populations with occupational and/or residential exposure, including Plaintiff of the increased risk of developing severe and permanent injuries, including, but not limited to, the increased and unnecessary risk of causing or contributing to cause clinically significant neurodegenerative disease, including Parkinson's Disease known to Defendants to be associated with Paraquat exposure.

42.     The Paraquat herbicide was unaccompanied by appropriate and adequate warnings regarding the risk of developing severe and permanent injuries, including, but not limited to, the

increased and unnecessary risk of causing or contributing to cause clinically significant neurodegenerative disease, including Parkinson's Disease known to Defendants to be associated with Paraquat exposure.

43.     The warnings for Paraquat did not accurately reflect the risk, incidence, symptoms, scope, or severity of such injuries to the consumer and/or populations with occupational and/or residential exposure.

44.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, failed to provide adequate warnings to purchases of Paraquat and/or populations with occupational and/or residential exposure, including Plaintiff and Plaintiffs' employer, of the increased and unnecessary risk of causing or contributing to cause clinically significant neurodegenerative disease, including Parkinson's Disease.

45.     Paraquat did not include warnings of its serious side effects; Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, deliberately failed to include such warnings to maximize their profits from Paraquat sales.

46.     The Paraquat herbicide was defective due to inadequate post-marketing warnings or instructions:

     a    After Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or should have known of the risk of serious bodily harm from the use of Paraquat, Defendants failed to provide an adequate warning to the product's users, consumers, and/or or populations with occupational and/or residential exposure about that risk of serious bodily harm.

b. After Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or should have known of the increased and unnecessary risk of causing or contributing to cause clinically significant neurodegenerative disease, including Parkinson's Disease, due to Paraquat exposure, Defendants failed to provide an adequate warning to the product's users, consumers, and/or populations with occupational and/or residential exposure.

47.   Consumers and/or populations with occupational and/or residential exposure, including Plaintiff and Plaintiffs' employer, neither knew nor had reason to know at the time of Plaintiffs' exposure to Paraquat of the existence of the aforementioned facts about Paraquat.

48.   Ordinary consumers, residents, and occupational users would not have recognized the potential risks or side effects of which Defendants failed to appropriately warn, and of which Defendants, Defendants' corporate predecessors, and others with whom they acted in concert concealed.

49.   Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, failed to adequately and correctly warn the Plaintiff, Plaintiffs' employer, the public, and regulatory agencies:

a. Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b. When inhaled, ingested, or absorbed into the bodies of persons who used

Paraquat, who were nearby while it was being used, or who entered fields, orchards, or railways where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure.

50.     Paraquat was unreasonably dangerous and defective because it was unaccompanied by any adequate warnings regarding its hidden and/or latent risks:

a.   It was not accompanied by directions for use that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered field, orchards, or railways where it had been sprayed or areas near where it had been sprayed; and

b.   It was not accompanied by a warning that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields, orchards or railways where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure.

51.     The Paraquat herbicide which Plaintiff was exposed to was not misused nor materially altered.

52.     Had Plaintiff and/or consumers in Plaintiffs' state of residence and/or Plaintiffs' employer been adequately warned of the increased risk of the increased and unnecessary risk of causing or contributing to cause clinically significant neurodegenerative disease, including Parkinson's Disease associated with Paraquat, Plaintiff would not have used Paraquat and/or been exposed to Paraquat.

53.     Had Plaintiff not used and/or been exposed to Paraquat, Plaintiff would not have suffered the injuries and damages as described herein.

54.     Plaintiff and Plaintiffs' employer, by the exercise of reasonable care, discover the defective nature of Paraquat due to inadequate warnings and instructions and/or perceive its hidden, unknown, and unreasonably dangerous risks prior to Plaintiffs' exposure.

55.     As a direct and proximate result of the defective nature of the Paraquat herbicide due to inadequate warnings and instructions, Plaintiffs' employer supplied Plaintiff with and/or exposed Plaintiff to Paraquat.

56.     As a direct and proximate result of the defective nature of the Paraquat herbicide due to inadequate warnings and instructions, purchasers of Paraquat in Plaintiffs' state of residence sprayed Paraquat and exposed Plaintiff to Paraquat.

57.     As a direct and proximate result of the defective nature of the Paraquat herbicide due to inadequate warnings and instructions, Plaintiff used and/or was exposed to Paraquat.

58.     As a direct and proximate result of Plaintiff's and/or Plaintiff's employer's, and/or purchasers of Paraquat in Plaintiffs' state of residence reasonably anticipated use of Paraquat, Plaintiff suffered the serious injuries as alleged herein.

59.     As a direct and proximate result of purchasers of Paraquat's reasonably anticipated use of Paraquat in Plaintiffs' state of residence, Plaintiff suffered the serious injuries as alleged

herein.

60.     The defective nature of Paraquat due to inadequate warnings and instructions was a substantial, proximate, and contributing factor in causing the Plaintiffs' injuries.

61.     As a direct and proximate result of the defective nature of Paraquat due to inadequate warnings and instructions, Plaintiff sustained serious personal injuries and related losses and damages as alleged herein.

62.     Defendants SCPLLC, and SAG, their corporate predecessors, and others with whom they acted in concert, are each therefore strictly liable for the Plaintiffs' injuries and damages sustained proximately caused by Plaintiffs' use of the Paraquat herbicide.

63.     Defendants Chevron U.S.A., Inc., their corporate predecessors, and others with whom they acted in concert, are each therefore strictly liable for the Plaintiffs' injuries and damages sustained proximately caused by Plaintiffs' use of the Paraquat herbicide.

64.     Defendants, their corporate predecessors, and others with whom they acted in concert, are jointly and severally liable to Plaintiff for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief.

**COUNT III NEGLIGENCE**

65.     Plaintiff incorporates by reference all prior allegations.

66.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the U.S. Paraquat business.

67.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed Paraquat intending or expecting that it would be sold and used in the state of Plaintiffs' residence.

68. Defendants, Defendants' corporate predecessors, and others with whom they acted in concert are held to the standard of an expert in the field of herbicide design, manufacture, and marketing.

69. Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, distributed, and/or introduced into the stream of commerce the Paraquat herbicide.

70. Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, packaged, labeled, re-packaged, marketed, promoted, supplied, distributed, sold, and/or introduced into the stream of commerce the Paraquat herbicide to consumers, including Plaintiff and/or Plaintiffs' employer, and independently created marketing materials for Paraquat.

71. Defendants, Defendants' corporate predecessors, and others with whom they acted in concert had a duty to exercise ordinary and reasonable care in the design, research, manufacture, marketing, testing, advertisement, supply, promotion, packaging, sale, and distribution of Paraquat including the duty to take all reasonable steps necessary to manufacture and sell a product that was not defective and unreasonably dangerous to consumers and users of the product.

72. Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, each had a duty to warn consumers and/or populations with occupational and/or residential exposure, including Plaintiff and Plaintiffs' employer, of the material and significant risks of serious bodily injury and neurodegenerative disease resulting from and/or associated with Paraquat exposure, which Defendants knew or should have known existed.

73. Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, each had a duty to warn consumers and/or populations with occupational and/or

residential exposure, including but not limited to Plaintiff and/or Plaintiffs' employer, of the potential hazards of Paraquat, increased risk of developing severe and permanent injuries, including, but not limited to, the increased and unnecessary risk of causing or contributing to cause clinically significant neurodegenerative disease, including Parkinson's Disease known to Defendants to be associated with Paraquat exposure.

74.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of Paraquat because Defendants knew, or should have known, that Paraquat causes or contributes to cause clinically significant neurodegenerative disease, including Parkinson's Disease, and was therefore not safe for the persons whom it was reasonably foreseeable could be exposed to it, including Plaintiff.

75.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, failed to exercise due care in the labeling of Paraquat and failed to issue to consumers and/or populations with occupational and/or residential exposure, including Plaintiff and Plaintiffs' employer, adequate warnings as to the risk of serious bodily injury, including causing or contributing to cause clinically significant neurodegenerative disease, including Parkinson's Disease, resulting from its use and/or exposure to area where used.

76.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, continued to manufacture and market the product despite the knowledge when Paraquat was used in the intended and directed manner or a reasonably foreseeable manner, that Paraquat posed a serious risk of bodily harm to consumers:

  a.   It was designed, manufactured, formulated, and packages such that it was likely

to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields, orchards, or railways where it had been sprayed or areas near where it had been sprayed; and

b.  When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields, orchards, or railways where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure.

77.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, knew, or should have known, that consumers, such as Plaintiff, would foreseeably suffer injury as a result of Defendants' failure to exercise reasonable care.

78.    Defendants, Defendants' corporate predecessors', and others with whom they acted in concert's, failure to exercise reasonable care in the manufacture, design, marketing, labeling, and sale of Paraquat was a breach of their duty. Defendants, Defendants' corporate predecessors, and others with whom they acted in concert negligently:

a.  Failed to design, manufacture, formulate, and package Paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

b.  Designed, manufactured, and formulated Paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were

nearby while it was being used, or who entered fields, orchards, or railways where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure;

c. Failed to perform adequate testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d. Failed to perform adequate testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after the spraying;

e. Failed to perform adequate testing to determine the extent to which Paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields, orchards, or railways where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long

after exposure;

f.  Failed to perform adequate testing to determine the extent to which Paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure;

g.  Failed to direct that Paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields, orchards, or railways where it had been sprayed or areas near where it had been sprayed; and

h.  Failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure.

79.     Defendants, Defendants' corporate predecessors', and others with whom they acted in concert's, failure to exercise such care resulted in Plaintiffs' use of and/or exposure to Paraquat and proximately caused Plaintiffs' injuries and damages and alleged herein.

80.     Defendants, Defendants' corporate predecessors', and others with whom they acted in concert's breach of duty was a direct and proximate cause of Plaintiffs' use of and/or exposure to Paraquat, resulting in Plaintiffs' injuries.

81.     As a direct and proximate consequence of Defendants, Defendants' corporate predecessors', and others with whom they acted in concert's negligence, Plaintiff sustained serious personal injuries and related losses as alleged herein, and suffered damages, and Defendants are liable to Plaintiff for Plaintiffs' resulting damages.

82.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, are jointly and severally liable to Plaintiff for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief.

83.     As a direct and proximate result of the negligence of Defendants SCPLLC, and SAG., their corporate predecessors, and others with whom they acted in concert, Plaintiff developed Parkinson's Disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of  his life.

84.     As a direct and proximate result of the negligence of Defendant Chevron U.S.A., Inc., their corporate predecessors, and others with whom they acted in concert,

Plaintiff developed Parkinson's Disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## COUNT IV BREACH OF EXPRESS WARRANTY

85.     Plaintiff incorporates by reference all prior allegations.

86.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the U.S. Paraquat business.

87.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed Paraquat intending or expecting that it would be sold and used in the state of Plaintiffs' residence.

88.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, are held to the standard of an expert in the field of herbicide design, manufacture, and marketing.

89.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, were aware that consumers and/or populations with occupational and/or residential exposure, including but not limited to Plaintiff and/or Plaintiffs' employer, would use Paraquat and/or be exposed to Paraquat.

90.     The Paraquat herbicide was expected to, and did, reach Plaintiff and consumers in Plaintiffs' state of residence with no substantial change in the condition in which Defendants,

Defendants' corporate predecessors, and others with whom they acted in concert, put the product into the stream of commerce, without substantial change in the condition in which it was manufactured, marketed, and sold by Defendants.

91.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, intended that Paraquat be used in the manner that Plaintiff and/or Plaintiffs' employer, and/or consumers in Plaintiffs' state of residence used it.

92.     At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert's intended that Paraquat be sprayed and administered in the manner that Plaintiff and/or Plaintiffs' employer, and/or consumers in Plaintiffs' state of residence sprayed and administered Paraquat.

93.     Plaintiff was a foreseeable user and/or individual exposed to Paraquat.

94.     Plaintiff, Plaintiff's employer, and residents in Plaintiffs' state of residence were foreseeable users as administrators and/or persons exposed to Paraquat.

95.     Plaintiff was at all times in privity with Defendants.

96.     Plaintiff's employer and users of Paraquat in Plaintiffs' state of residence were at all relevant times in privity with Defendants, Defendants' corporate predecessors, and others with whom they acted in concert.

97. Defendants, Defendants' corporate predecessors, and others with whom they acted in concert made the following express warranties regarding Paraquat:

   a)   that it was safe and fit for use by consumers;
   b)   fit for its intended purpose of weed and grass control;
   c)   safe for its intended purpose and did not carry the hidden and inherent risk of serious physical injury;
   d)   that it was adequately tested and fit for its intended use.

98.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert's representations and warranties, as alleged above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the good (Paraquat) and became

part of the basis of the bargain creating an express warranty that Paraquat would conform to these affirmations of fact or promises.

99.     Defendants, Defendants' corporate predecessors, and others with whom they acted in concert breached this warranty regarding each sale of paraquat to which Plaintiff was exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used, and in particular:

      a.   It was designed, manufactured, formulated, and packages such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

      b.   When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure.

100.     Users and/or populations with occupational and/or residential exposure, including but not limited to Plaintiff and/or Plaintiffs' employer, relied upon the representations and warranties that Defendants made about the use, administration, and/or exposure of Paraquat.

101.     Plaintiff justifiably relied on Defendants', Defendants' corporate predecessors', and others with whom they acted in concert's' express warranties about Paraquat.

102.     Plaintiffs' employer justifiably relied on Defendants, Defendants' corporate predecessors, and others with whom they acted in concert's express warranties about Paraquat.

103.     Users of Paraquat in Plaintiffs' state of residence justifiably relied on Defendants', Defendants' corporate predecessors', and others with whom they acted in concert's express

warranties about Paraquat.

104.    In reliance on Defendants, Defendants' corporate predecessors, and others with whom they acted in concert's express warranties, users of Paraquat, including Plaintiff and/or Plaintiffs' employer, and other individuals and entities in Plaintiffs' state of residence, used Paraquat in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

105.    In reliance on Defendants, Defendants' corporate predecessors', and others with whom they acted in concert's express warranties, users of Paraquat, including Plaintiff and/or Plaintiffs' employer, and other individuals and entities in Plaintiffs' state of residence, used Paraquat in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

106.    Paraquat did not conform to these express warranties because Paraquat: was not safe; had serious, hidden side effects of which Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, did not adequately warn or instruct; and was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure

107.    At the time of making such express warranties, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, knew or should have known that Paraquat did not conform to these express warranties and representations because Paraquat was not safe and had numerous serious side effects of which Defendants did not accurately warn or instruct.

108.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, thus breached the express warranties they made to Plaintiff and/or Plaintiffs' employer and/or purchasers of Paraquat, with respect to the Paraquat herbicide.

109.    As  a  direct  and  proximate  result  of  Defendants,  Defendants'  corporate

predecessors, and others with whom they acted in concert's breach of express warranties regarding

Paraquat, Plaintiff used and/or was exposed to Paraquat, and sustained injuries as alleged.

110.    Defendants, Defendants' corporate predecessors', and others with whom they acted

in concert's breaches of their express warranties constitute violations of common law principles

and Cal. U. Com. Code § 2313(1); Cal. Civ. Code §1791.2(a).

111.    As a direct and proximate result of the breaches of express warranty by SCPLLC,

SAG, Chevron U.S.A., Inc. their corporate predecessors, and others with whom they acted in

concert, Plaintiff developed Parkinson's Disease; has suffered severe and permanent physical pain,

mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered

the loss of a normal life and will continue to do so for the remainder of his life; has lost income

that he otherwise would have earned and will continue to do so for the remainder of his life; and

has incurred reasonable expenses for necessary medical treatment and will continue to do so for

the remainder of his life.

112.    Defendants, Defendants' corporate predecessors, and others with whom they acted

in concert, are jointly and severally liable to Plaintiff for compensatory and punitive damages,

together with interest, costs of suit, attorneys' fees and all such other relief.

## COUNT V BREACH OF IMPLIED
## WARRANTY Of MERCHANTABILITY

113.    Plaintiff incorporates by reference all prior allegations.

114.    At all relevant times, Defendants, Defendants' corporate predecessors, and others

with whom they acted in concert, were engaged in the U.S. Paraquat business.

115.    At all relevant times, Defendants, Defendants' corporate predecessors, and others

with whom they acted in concert, designed, researched, developed, manufactured, tested, labeled,

advertised, promoted, marketed, sold, supplied, and/or distributed Paraquat intending or expecting

that it would be sold and used in the state of Plaintiffs' residence.

116.    Defendants, Defendants' corporate predecessors, and others with whom they acted

in concert, are held to the standard of an expert in the field of herbicide design, manufacture, and

marketing.

117.    At all relevant times, Defendants, Defendants' corporate predecessors, and others

with whom they acted in concert, were aware that consumers and/or populations with occupational

and/or residential exposure, including but not limited to Plaintiff and/or Plaintiffs' employer,

would use Paraquat and/or be exposed to Paraquat.

118.    The Paraquat herbicide was expected to, and did, reach Plaintiff and consumers in

Plaintiffs' state of residence with no substantial change in the condition in which Defendants put

the product into the stream of commerce, without substantial change in the condition in which it

was manufactured, marketed, and sold by Defendants, Defendants' corporate predecessors, and

others with whom they acted in concert.

119.    At all relevant times, Defendants, Defendants' corporate predecessors, and others

with whom they acted in concert, intended that Paraquat be used in the manner that Plaintiff and/or

Plaintiffs' employer, and/or consumers in Plaintiffs' state of residence used it.

120.    At all relevant times, Defendants, Defendants' corporate predecessors, and others

with whom they acted in concert, intended that Paraquat be sprayed and administered in the manner

that Plaintiff and/or Plaintiffs' employer, and/or consumers in Plaintiffs' state of residence sprayed

and administered Paraquat.

121.    Plaintiff was a foreseeable user and/or individual exposed to Paraquat.

122.    Plaintiff, Plaintiffs' employer, and residents in Plaintiffs' state of residence were

foreseeable users as administrators and/or persons exposed to Paraquat.

123.    Plaintiff was at all times in privity with Defendants.

124.    Plaintiffs' employer and users of Paraquat in Plaintiffs' state of residence were at all

relevant times in privity with Defendants.

125.    Defendants made the following implied warranties regarding Paraquat:

a    of merchantable quality;

b. fit for its intended purpose of weed and grass control;

c. safe for its intended purpose and did not carry the hidden and inherent risk of serious physical injury;

d. adequately tested and was of fair and average quality for which it was marketed and sold;

e. effective for its intended purpose of weed and grass control and without adverse effects which outweighed its benefits;

f. would comply with Defendants' express warranties regarding Paraquat as alleged herein.

126.   Defendants, Defendants' corporate predecessors, and others with whom they acted in concert breached these warranties regarding each sale of paraquat to which Plaintiff was exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used, and in particular:

a. It was designed, manufactured, formulated, and packages such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b. When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure.

127.   Plaintiffs justifiably relied on Defendants', Defendants' corporate predecessors', and others with whom they acted in concert's, implied warranties about Paraquat's safety and efficacy.

128.   Plaintiffs' employer justifiably relied on Defendants', Defendants' corporate predecessors', and others with whom they acted in concert's implied warranties about Paraquat's safety and efficacy.

129.   Users of Paraquat in Plaintiffs' state of residence justifiably relied on Defendants', Defendants' corporate predecessors', and others with whom they acted in concert's

express warranties about Paraquat.

130.    In reliance on Defendants', Defendants' corporate predecessors', and others with whom they acted in concert's, implied warranties, users of Paraquat, including Plaintiff and/or Plaintiffs' employer, and other individuals and entities in Plaintiffs' state of residence, used Paraquat in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

131.    In reliance on Defendants', Defendants' corporate predecessors', and others with whom they acted in concert's implied warranties, users of Paraquat, including Plaintiff and/or Plaintiffs' employer, used Paraquat as prescribed and in a foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

132.    Paraquat did not conform to these implied warranties because Paraquat: was not safe; had serious, hidden side effects of which Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, did not adequately warn or instruct; and was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure.

133.    At the time of making such implied warranties, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, knew or should have known that Paraquat did not conform to these implied warranties.

134.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, thus breached the implied warranties they made to Plaintiff and/or Plaintiffs' employer and/or purchasers of Paraquat, with respect to the Paraquat herbicide.

135.   As a direct and proximate result of Defendants', Defendants' corporate predecessors', and others with whom they acted in concert's breach of implied warranties regarding Paraquat, Plaintiff used Paraquat and was injured as a result.

136.   Defendants', Defendants' corporate predecessors', and others with whom they acted in concert's breach of their implied warranties regarding the Paraquat herbicide violated Cal. Comm. Code§§ 2314, et seq.

137.   As a direct and proximate result of the breaches of express warranty and the implied warranty of merchantability by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff developed Parkinson's Disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life

138.   As a direct and proximate result of the breaches of express warranties and the implied warranty of merchantability by Chevron U.S.A., Inc., its corporate predecessors, and others with whom it acted in concert, Plaintiff developed Parkinson's Disease, has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

139.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, are jointly and severally liable to Plaintiffs for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief.

## COUNT VII: LOSS OF CONSORTIUM
### (Against all Defendants)

140.    Plaintiffs incorporate by reference all prior allegations.

141.    At all relevant times hereto, Plaintiff, CURT MATTHESS, was married to KATHLEEN MATTHESS, who has suffered severe physical injuries, emotional distress, economic losses, and other damages as a result of the Plaintiff's injuries from Paraquat herbicide use and/or exposure.

142.    For the reasons set forth herein, KATHLEEN MATTHESS has paid for, and has become liable to pay for, Plaintiff's medical aid, treatment, monitoring, medications, and other expenditures.

143.    As a direct and proximate result of Paraquat herbicide exposure, Plaintiff's and KATHLEEN MATTHESS's marital relationship was impaired and depreciated, resulting in the disintegration and deterioration of the family unit and the relationships existing therein.

144.    As a direct and proximate result of Plaintiff's Paraquat exposure, KATHLEEN MATTHESS, has been and will continue to be deprived of the support, companionship, care, services, society, love, and affection of Plaintiff.

145.    As a direct and proximate result of Plaintiff's Paraquat exposure, KATHLEEN MATTHESS has sustained, and will continue to sustain, severe physical injuries, emotional distress, mental anguish, economic losses, and other damages for which she is entitled to recovery of damages.

146.    Defendants SCPLLC, SAG and Chevron U.S.A., Inc, Defendants' corporate

predecessors, and others with whom they acted in concert, are jointly and severally liable to

KATHLEEN MATTHESS for all general, special, and equitable relief, compensatory and punitive

damages, together with interest, costs of suit, attorneys' fees and all such other relief.

## I.      PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against each of the Defendants as

appropriate to each cause of action alleged as follows:

a. For general damages, including without limitation, past and future pain and suffering, emotional distress, loss of enjoyment of life, and other consequential damages as allowed by law in an amount to be proven at the time of trial;
b. For special damages in an amount to be proven at the time of trial;
c. For statutory damages as set forth above;
d. For exemplary and punitive damages in an amount to be proven at the time of trial, and sufficient to punish Defendants or to deter Defendants and others from repeating the injurious conduct alleged herein;
e. For pre-judgment and post-judgment interest on general and special damages;
f. For costs of this suit and attorneys' fees; and
g. All other relief that this Court deems necessary, proper, and just.

## II.      DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury of all claims so triable.

Dated: December 6, 2023                           Respectfully submitted,

_____

Christian R. Thompson, Esq.
Marc J. Bern & Partners LLP
60 E. 42nd St., Suite 950 New
York, NY 10165
Tel: 212.702.5000
Fax: 212.818.0164
Email: cthompson@bernllp.com
*Attorney for Plaintiff*